**PRIMA TEK II, L.L.C. and Southpac Trust Int'l, as Trustee for the Family Trust U/T/A dated 12/8/95, Plaintiffs,**

v.

**POLYPAP SARL, a French Corporation, Philippe Charrin, and Andre Charrin, Defendants.**

**No. 99–CV–0220–MJR.**

United States District Court, S.D. Illinois.

April 30, 2004.

Bruce N. Cook, Cook, Ysursa et al., Belleville, IL, G. Neal Rogers, Joseph P. Titterington, Robert T. Pipes, Dunlap, Codding et al., Oklahoma City, OK, for Plaintiffs.

Daniel J. O'Connor, David I. Roche, Erin M. McCloskey, Baker & McKenzie, Chicago, IL, for Defendants.

## MEMORANDUM AND ORDER

REAGAN, District Judge.

### I. CASE HISTORY AND SUMMARY

On March 29, 1999, Plaintiffs, Prima Tek II, L.L.C. ("Prima Tek") and Southpac Trust International, Inc., as Trustee for the Family Trust under a trust agreement dated December 8, 1995 ("Southpac"), filed a two-count complaint under 35 U.S.C. § 271 against Defendants, Polypap, S.A.R.L., a Society of the Republic of France ("Polypap"), Philippe Charrin, and Andre Charrin, alleging they infringed upon two patents owned by Plaintiffs involving decorative assemblies for holding and supporting a floral grouping without the need for a pot by producing, manufacturing, and selling a product called the "Bouquett'O." The Bouquett'O is a thin, semicircular piece of stiff plastic which, when shaped into a cone, receives the stems of flowers through an open hole on top. The Bouquett'O then is placed upon a waterproof, usually decorative floral wrapping which is gathered around the upper neck of the Bouquett'O and tied. This allows flowers to be freestanding without a vase or pot and without being placed into a medium such as potting soil or floral foam. Water is added to the same opening where the floral stems were inserted, providing nourishment and stability to the floral grouping. The Bouquett'O comes in five sizes and is inexpensive to ship, because it lies flat until folded into a conical shape. It is inexpensive to use, because it requires no vase or pot and the entire finished product—Bouquett'O, flowers and all—is disposable.

Plaintiffs claim Defendants have infringed upon United States Patent No. 5,410,-856 regarding a decorative assembly for a floral grouping ("the '856 patent") and United States Patent No. 5,615,532 regarding the method of making a decorative

assembly for floral grouping ("the '532 patent") in several ways. In summary, Plaintiffs claim that Polypap has directly infringed upon one or more claims of the '856 and '532 patents by making and using the Bouquett'O. Second, Plaintiffs claim that Polypap has induced infringement of the patents by instructing third party customers on how to construct and use the Bouquett'O. Next, Plaintiffs claim that Polypap engaged in contributory infringement of the patents by selling and offering the Bouquett'O for sale. Last, Plaintiffs allege that the inventors of the Bouquett'O, Andre Charrin (the owner of Polypap) and Philippe Charrin (the President, CEO, and Chairman of the Board of Polypap), also have committed contributory infringement by exercising day-to-day control of Polypap's activities. *See* Plaintiffs' Amended Complaint.

Plaintiffs allege all such infringement has caused irreparable harm. Plaintiffs seek preliminary and permanent injunctions prohibiting Defendants from making, using, or selling the Bouquett'O or instructing others in its use. Plaintiffs do not seek monetary damages for any alleged infringement.

## II. *PROCEDURAL HISTORY & CURRENT STATUS*

In 2001, this Court issued a *Markman* Order construing disputed claim terms, applied the terms as it had construed them, and granted Defendants' motion for summary judgment. Plaintiffs appealed. After hearing the case, the Federal Circuit vacated this Court's Order and remanded the case for further proceedings. *See Pri-* *ma Tek II, L.L.C. v. Polypap S.A.R.L.*, 318 F.3d 1143 (Fed.Cir.2003). In July and October 2003, the parties tried the case before the bench. Below are the Court's findings of fact and conclusions of law.

## III. FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs' first claim alleges that Polypap has directly infringed upon one or more claims of the '856 and '532 patents by making and using Plaintiffs' product, the Bouquett'O. Infringement analysis requires two steps. *Prima Tek II, L.L.C.* at 1148. The first step is to determine the meaning and scope of the patent claims asserted to be infringed. *Id.* The second step is to compare the properly construed claims to the device accused of infringing. *Id.* The first step—claim construction—is a question of law, while the second step—infringement—is a question of fact. *Id.* The instant case was a bench trial, so both steps are Court determinations.

### A. *Claim Construction*

On appeal, the Federal Circuit found that this Court's definition of the claim term "floral holding material" was incorrect and instructed that the term should be given its ordinary meaning. The Federal Circuit also held that this Court's limitation of "floral holding material" to floral foam or soil and its requirement that the stem ends be inserted into the floral holding material were also erroneous. As such, the definitions of the disputed claim terms used by this Court, as altered by the Federal Circuit's instructions, are as follows:

| U.S. Patent No. 5,615,532 *Method of Making a Decorative Assembly for a Floral Grouping* | Construction |
| --- | --- |
| A. Floral holding material (Claims 9–11, 13–15) | Has an upper end, a lower end and an outer peripheral surface and is construct- |

| | Construction |
|---|---|
| | ed of a material capable of receiving a portion of the floral grouping and supporting the floral grouping without any pot means |
| B. Material capable of receiving a portion of the floral grouping and supporting the floral grouping without any pot means (Claims 9–11, 13–15) | Is any material that can function as floral holding material which supports the floral grouping without a closed bottom receptacle such as a flower pot, vase, etc. |
| C. Disposing the stem in the floral holding material (Claims 9–11; 13–15) | Means the "floral holding material" receives a portion of the floral grouping |
| **U.S. Patent No. 5,410,856**<br>***Decorative Assembly for***<br>***a Floral Grouping*** | **Construction** |
| D. Floral holding material (Claims 1–5; 7–11; 15–16; 19–24; 29–30; 33–36; 39; 43–45; 48) | Has an upper end, a lower end and an outer peripheral surface and is constructed of a material capable of receiving a portion of the floral grouping and supporting the floral grouping without any pot means |
| E. Material capable of receiving a portion of the floral grouping and supporting the floral grouping without any pot means (Claims 1–5; 7–11; 15–16; 19–24; 29–30; 33–36; 39; 43–45; 48) | Is any material that can function as floral holding material which supports the floral grouping without a closed bottom receptacle such as a flower pot, vase, etc. |
| F. Stem ends disposed in floral holding material (Claims 15–16; 19–24) | Means the "floral holding material" receives a portion of the floral grouping |
| G. Disposing the stem in the floral holding material (Claims 29–30; 33–36; 39; 43–45; 48) | Means the "floral holding material" receives a portion of the floral grouping |
| H. Overlapping fold is substantially bonded (Claims 1–5; 7–11; 15–16; 19–24; 29–30; 33–36; 39; 43–45) | Means the overlapping folds that are formed in the sheet of material when it is gathered or crimped about the upper end of the floral holding material is held in place with a band or bonding material |

## B. *Infringement*

■ Having properly construed the claim terms (see above), the Court must compare those terms with the allegedly infringing device and determine whether the accused device is within the scope of the properly construed claim terms. *Prima Tek II*, 318 F.3d at 1153; *Dolly, Inc. v. Spalding & Evenflo Cos., Inc.*, 16 F.3d 394, 397 (Fed.Cir.1994). To show infringement, a plaintiff must establish that the accused device includes every limitation of the claim or an equivalent of each limitation. *Id.*

In the case at bar, Plaintiffs assert two claims against Polypap—one from each of the two patents in suit: claim 15 of the '856 patent and claim 9 of the '532 patent. Using the above analysis, Plaintiffs must therefore establish that the Bouquett'O and its method of assembly include every limitation of the patent claims at issue in order to show infringement upon the patents.

### 1. *Comparison of the Asserted Claims to the Accused Product and Method*

#### a. *Claim 15 of the '856 Patent*

Claim 15 of the '856 patent reads as follows:

A decorative assembly comprising:

a floral grouping having a bloom end and a stem end;

a floral holding material having an upper end, a lower end and an outer peripheral surface, the floral holding material being constructed of a material capable of receiving a portion of the floral grouping and supporting the floral grouping without any pot means, the stem end of the floral grouping being disposed in the floral holding material and the floral holding material supporting the floral grouping with a portion of the floral grouping near the bloom end thereof extending a distance upwardly beyond the upper end of the floral holding material;

a sheet of material having an upper surface, a lower surface and an outer periphery, the upper surface of the sheet of material being disposed adjacent a portion of the outer peripheral surface of the floral holding material and the sheet of material extending about a portion of the outer peripheral surface of the floral holding material, the sheet of material extending about the outer peripheral surface of the floral holding material and leaving uncovered a portion of the floral holding material near the upper end thereof uncovered whereby the floral grouping extends upwardly beyond the upper end of the floral holding material and above the sheet of material; and

means for forming a crimped portion in the sheet of material with the crimped portion cooperating to hold the sheet of material in the position extended about the floral holding material to provide a decorative covering, the crimped portion being formed in the sheet of material near the upper end of the floral holding material wherein the means for forming a crimped portion is used to form at least one overlapping fold in the sheet of material, which overlapping fold is substantially bonded via the means for forming the crimped portion and the crimped portion engaging a portion of the floral holding material for cooperating to hold the sheet of material in the position extended about the floral holding material to provide a decorative covering.

Comparing the individual elements of claim 15 to the finished product constructed using the Bouquett'O, such as those shown in trial exhibits including Polypap's internet website (Plaintiffs' Exhibit 7B), advertisements (Defendants' Exhibit 4), and promotional videotape (Plaintiffs' Exhibit 8), the Court finds as follows:

1. The first element of claim 15 of the '856 patent requires: "*a decorative assembly comprising: a floral grouping having a bloom end and a stem end....*" The Court finds that the requirements of this element have been met. When used for its sole intended purpose, the finished product created using a Bouquett'O is part of an overall decorative assembly which contains a floral grouping having a bloom end and a stem end. This fact was confirmed by numerous exhibits, as well as Defendants' expert witness, Richard Haslam.

2. The next element of claim 15 requires: "*a floral holding material having an upper end, a lower end and an outer peripheral surface, the floral holding material being constructed of a material capable of receiving a portion of the floral grouping and supporting the floral grouping without any pot means...*" The Court finds that the requirements of this element also have been met. First, Defendants' expert, Richard Haslam, specifically testified to these facts—that the Bouquett'O is a device which has an upper end, a lower end and an outer peripheral surface. He also testified that the Bouquett'O is constructed of plastic, a material which renders the cone capable of receiving and supporting the floral grouping without any pot means. Furthermore, the evidence at

trial has shown no legitimate dispute regarding the real use to which the Bouquett'O is put. In its flattened state, the Bouquett'O has no function. Once fashioned into a cone, however, its function becomes apparent. In its conical shape, the Bouquett'O is a three-dimensional device. It has an upper end, a lower end, and an outer peripheral surface. It is constructed of plastic, a material which provides sufficient structure to the device so as to allow it to receive and support a floral grouping without any additional pot means. Accordingly, the Court finds that the Bouquett'O falls squarely within the definition of "floral holding material," as it has been construed by this Court.

3. The next element of claim 15 states: "*the stem end of the floral grouping being disposed in the floral holding material and the floral holding material supporting the floral grouping with a portion of the floral grouping near the bloom end thereof extending a distance upwardly beyond the upper end of the floral holding material....*" The Court finds that the requirements of this element have been met. All evidence demonstrates that the stem ends of the floral grouping are disposed in the finished decorative floral assembly constructed from the Bouquett'O, that the Bouquett'O supports the floral grouping, and that a portion of the floral grouping near the bloom end extends upwardly beyond the upper end of the cone fashioned from the Bouquett'O.

4. The next element of claim 15 requires: "*a sheet of material having an upper surface, a lower surface and an outer periphery....*" The Court finds that the requirements of this element have been met. The finished decorative floral assembly constructed from the Bouquett'O uses a sheet of material which is wrapped up and around the plastic cone. There is no question that the sheet has an upper surface, a lower surface, and an outer periphery.

5. The next element of claim 15 states: "*the upper surface of the sheet of material being disposed adjacent a portion of the outer peripheral surface of the floral holding material and the sheet of material extending about a portion of the outer peripheral surface of the floral holding material....*" The Court finds that the requirements of this element have been met. In the decorative floral assembly constructed using the Bouquett'O, the upper surface of the sheet of material is placed near a portion of the outer peripheral surface of the cone, and the sheet of material extends around the outside of the cone.

6. The next element of claim 15 states: "*the sheet of material extending about the outer peripheral surface of the floral holding material and leaving uncovered a portion of the floral holding material near the upper end thereof uncovered whereby the floral grouping extends upwardly beyond the upper end of the floral holding material and above the sheet of material....*" The Court finds that the requirements of this element have been met.

In the finished decorative floral assembly constructed from the Bouquett'O, the sheet of material extends around the cone, and a portion of the cone is uncovered at its apex. The Court rejects Defendants' contention that no portion of the cone remains uncovered. The Court notes testimony from Andre Charrin in which he admitted that water is poured into the completed assembly through an opening formed at the apex of the cone, as well as testimony from defense expert Haslam who testified that the bloom ends of the floral grouping are not covered by the sheet of material and that water may be poured into the cone through the opening formed at the apex of the cone. The

Court further finds that the floral grouping extends upwardly through the apex of the cone and above both the cone and the sheet of material.

7. The next element of claim 15 requires: a *"means for forming a crimped portion in the sheet of material with the crimped portion cooperating to hold the sheet of material in the position extended about the floral holding material to provide a decorative covering...."* The Court finds that the requirements of this element have been met. When the sheet of material is gathered up and around the cone fashioned from the Bouquett'O and a band is placed around the sheet, a crimped portion is created in the sheet of material which assists in holding the sheet of material in position around the cone to provide a decorative covering.

8. The final element of claim 15 states: *"the crimped portion being formed in the sheet of material near the upper end of the floral holding material wherein the means for forming the crimped portion is used to form at least one overlapping fold in the sheet of material, which overlapping fold is substantially bonded via the means for forming the crimped portion and the crimped portion engaging a portion of the floral holding material for cooperating to hold the sheet of material in the position extended about the floral holding material to provide a decorative covering."* The Court finds that the requirements of this element have been met. The crimped portion formed when the sheet of material is gathered about the outside of the cone fashioned from the Bouquett'O is located near the upper end of the cone. When the material is gathered to form the crimped portion, at least one overlapping fold is created in the sheet of material. To "substantially bond" the fold as defined by the Court above, the fold must be secured using a band or bonding material. Although the Court heard no evidence that

Polypap has used or teaches the uses of an adhesive bond, the evidence demonstrated that Polypap consistently uses and instructs the use of a band or a ribbon tied at the apex of the cone to hold the sheet of material in place. As such, the crimped portion of the material touches a portion of the cone and assists in holding the sheet of material in position around the cone to provide a decorative covering.

### b. Claim 9 of the '532 Patent

Claim 9 of the '532 patent reads as follows:

A method for providing a decorative covering comprising:

providing a floral grouping having a bloom end and a stem end;

providing a floral holding material having an upper end, a lower end and an outer peripheral surface, the floral holding material being constructed of a material capable of receiving a portion of the floral grouping and supporting the floral grouping without any pot means;

providing a sheet of material having an upper surface, a lower surface and an outer periphery;

disposing the stem end of the floral grouping in the floral holding material;

disposing the upper surface of the sheet of material near the outer peripheral surface of the floral holding material and extending the sheet of material about at least a portion of the outer peripheral surface of the floral holding material while leaving at least a portion of the upper end of the floral holding material uncovered, the upper surface of the sheet of material being disposed adjacent the outer peripheral surface of the floral holding material; and

disposing banding means about the sheet of material in a position circumferentially about the floral holding material causing the banding means to press a

portion of the sheet of material against the outer surface of the floral holding material for cooperating to hold the sheet of material in the position extended about the floral holding material to provide the decorative covering.

Comparing the individual elements of claim 9 to the methods both taught and used by Defendants to construct a decorative assembly using the Bouquett'O, the Court finds as follows:

1. The first element of claim 9 of the '532 patent states: *"providing a floral grouping having a bloom end and a stem end...."* The Court finds that the requirements of this element have been met. In its sales literature (Defendants' Exhibit 4), advertisements (Plaintiffs' Exhibit 20) and promotional videotape (Plaintiffs' Exhibit 8), and in the numerous demonstrations of the use of the Bouquett'O conducted and described at trial, Polypap provides detailed instructions on how to create a decorative floral assembly using a floral grouping having a bloom end and a stem end by using the Bouquett'O.

2. The next element of claim 9 states: *"providing a floral holding material having an upper end, a lower end and an outer peripheral surface, the floral holding material being constructed of a material capable of receiving a portion of the floral grouping and supporting the floral grouping without any pot means...."* The Court finds that the requirements of this element have been met. As previously found by this Court, the Bouquett'O, when fashioned into a cone, falls squarely within the definition of "floral holding material" as construed by this Court.

3. The next element of claim 9 requires: *"providing a sheet of material having an upper surface, a lower surface and an outer periphery...."* The Court finds that the requirements of this element have been met. As previously found by this Court, Polypap teaches that the prop-

er use of the Bouquett'O is to create a decorative floral assembly using a sheet of material.

4. The next element of claim 9 requires: *"disposing the stem end of the floral grouping in the floral holding material...."* The Court finds that the requirements of this element have been met. As shown in its promotional videotape (Plaintiffs' Exhibit 8), Polypap teaches two ways of placing the floral grouping within the cone fashioned from the Bouquett'O. First, Polypap instructs users to place the stem ends of a floral grouping on a flattened Bouquett'O and form the Bouquett'O into a cone around the stems. Alternatively, Polypap instructs users to fashion the Bouquett'O into a cone and to insert the stem ends of the flowers into and through the opening formed at the apex of the cone. Regardless of the construction method used, the cone receives a portion of the floral grouping in either method.

5. The next element of claim 9 states: *"disposing the upper surface of the sheet of material near the outer peripheral surface of the floral holding material and extending the sheet of material about at least a portion of the outer peripheral surface of the floral holding material while leaving at least a portion of the upper end of the floral holding material uncovered, the upper surface of the sheet of material being disposed adjacent the outer peripheral surface of the floral holding material...."* The Court finds that the requirements of this element have been met. The methods taught by Polypap on the proper use of the Bouquett'O to create a decorative assembly include wrapping a sheet of material up and around the outer peripheral surface of the cone and extending the sheet of material over at least a portion of the outer peripheral surface of the cone. As previously discussed, a portion of the cone is left uncovered and the upper sur-

face of the sheet of material presses against the outer peripheral surface of the cone near its apex.

6. The final element of claim 9 states: *"disposing banding means about the sheet of material in a position circumferentially about the floral holding material causing the banding means to press a portion of the sheet of material against the outer surface of the floral holding material for cooperating to hold the sheet of material in the position extended about the floral holding material to provide the decorative covering."* The Court finds that the requirements of this element have been met. Among other methods, Polypap instructs that a ribbon or band may be used as a means of securing the sheet of material around the cone. This ribbon or band presses a portion of the sheet of material against the outer peripheral surface of the cone and assists in holding the sheet of material in a position extended around the cone to provide a decorative covering.

### 2. Analysis of Evidence of Direct Infringement

■ As indicated above, this Court has found that each and every limitation contained in claim 15 of the '856 patent is present in the decorative assembly for a floral grouping constructed using the Bouquett'O. Plaintiffs' evidence establishes that during the term of the '856 patent, Polypap has used the Bouquett'O in the United States without Plaintiffs' permission to construct decorative assemblies for floral groupings. These finished decorative assemblies were displayed at booths maintained by Polypap at trade shows held in Pittsburgh, Pennsylvania and Orlando,

Florida in 1998. The sole purpose for the display was to solicit orders for the Bouquett'O in the United States. **Accordingly, the Court FINDS that Plaintiffs have established by a preponderance of the evidence that Polypap has directly infringed claim 15 of the '856 patent.**

■ The Court also has found that each and every limitation contained in claim 9 of the '532 patent is present in the method used and taught by Polypap for constructing a decorative assembly for a floral grouping using a Bouquett'O. Plaintiffs' evidence establishes that during the term of the '532 patent, Polypap has used the Bouquett'O in the United States without Plaintiffs' permission to construct decorative assemblies for floral groupings by way of the method which meets each limitation of claim 9 of the '532 patent. These finished decorative floral assemblies constructed using the Bouquett'O were then displayed at the booth which Polypap maintained at the Pittsburgh and Orlando trade shows. **Accordingly, the Court FINDS that Plaintiffs have established by a preponderance of the evidence that Polypap directly infringed claim 9 of the '532 patent.[1]**

### C. Inducement of Infringement

Plaintiffs' second claim alleges that Polypap has induced infringement of the patents by instructing customers on how to construct and use the Bouquett'O. Under 35 U.S.C. § 271(b), "[w]hoever actively induces infringement of a patent shall be liable as an infringer."

■ To prevail on a claim of inducement, Plaintiffs first must show that there

---

1. In its proposed findings of fact and conclusions of law, Plaintiffs argue that Andre Charrin is also liable for direct infringement of claim 15 of the '856 patent. However, Plaintiffs have not made such a claim in their latest complaint. Moreover, corporate officers can only be found personally liable for direct infringement by their corporation if the corporate veil can be pierced. Herbert F. Schwartz, *Patent Law and Practice*, p. 134 (Bureau of National Affairs—Federal Judicial Center 3rd ed.2001). No evidence has been presented in this regard.

has been direct infringement. *Epcon Gas Systems, Inc. v. Bauer Compressors, Inc.,* 279 F.3d 1022, 1033 (Fed.Cir.2002). However, liability for active inducement requires direct infringement *by someone other than the inducer.* Schwartz, *Patent Law and Practice at* p. 136; *Jansen v. Rexall Sundown, Inc.,* 342 F.3d 1329, 1334 (Fed.Cir.2003); *Fuji Mach. Mfg. Co., Ltd. v. Hover–Davis, Inc.,* 936 F.Supp. 93, 95 (W.D.N.Y.1996). Second, Plaintiffs must show that Polypap knowingly induced the infringement and possessed specific intent to encourage the infringement of the patents by others. *Minnesota Mining and Manufacturing Co. v. Chemque, Inc.,* 303 F.3d 1294, 1305 (Fed.Cir.2002).

■ Proof of the predicate direct infringement or of the inducement of infringement may be shown by direct or circumstantial evidence. *Moleculon Research Corp. v. CBS,* 793 F.2d 1261, 1272 (Fed.Cir.1986).

■ In this case, Plaintiffs urge the Court to find that Polypap, through the actions of Andre and Philippe Charrin, induced others to directly infringe the patents at issue when they showed florists how to assemble the Bouquett'O and when they sold the Bouquett'O at the trade shows mentioned above. The Court addresses the demonstration of the Bouquett'O and the sale of the Bouquett'O separately.

The Court first finds that although Polypap (through the Charrins) may have instructed florists how to use the Bouquett'O at the various trade shows, these florists made the Bouquett'O floral arrangements for use at Polypap's own trade show booths. The florists did not use the Bouquett'O for their own purposes. The use of the Bouquett'O was solely for display at Polypap's booths for the benefit of Polypap. Therefore, there was no direct infringement by the florists mentioned above.

There is evidence, however, that a number of Bouquett'O units were sold to USB, a Polypap customer, which displayed the Bouquett'O as part of a finished decorative floral assembly at its booth at the Super Floral trade show held in the United States in 2003. Philippe Charrin testified that he personally handled the transaction whereby Polypap sold and delivered approximately 200,000 Bouquett'O units to USB at its offices in Miami, Florida and that he was aware that USB was attempting to sell the Bouquett'O at the 2003 trade show. This evidence supports a finding of direct infringement by USB.

■ However, the second element necessary to prove inducement is lacking. Although there was evidence that Plaintiffs had told Polypap that the Bouquett'O infringed upon Plaintiffs' patents before the trade shows at issue, there is also ample evidence that Polypap truly and in good faith believed that the Bouquett'O did not infringe upon Plaintiffs' patents and that the Bouquett'O was legally patented in France. Therefore, the Court cannot find that Polypap knowingly induced any infringement or specifically intended to encourage infringement by others. **Accordingly, the Court FINDS that Polypap is NOT liable for inducement of infringement.**[2]

---

**2.** In its proposed findings and conclusions, Plaintiffs maintain that Andre and Philippe Charrin are also liable for inducement of infringement. Although corporate officers who act culpably can be held liable for actively inducing their corporation's direct infringement, Plaintiffs failed to allege a claim of inducement against the Charrins in their latest complaint. Even if such inducement had been alleged, none would be found, because the Court finds no evidence that the Charrins had specific intent necessary to be liable for inducement.

## D. *Contributory Infringement*

■ Plaintiffs' last claims against Defendants are for contributory infringement. First, Plaintiffs allege that Polypap engaged in contributory infringement of the patents at issue by selling and offering the Bouquett'O for sale. *See* Plaintiffs' Amended Complaint, ¶ ¶ 11, 15. However, "contributory infringers are persons who aid and abet direct infringers *without themselves making, using, offering for sale, or selling the patented invention.*" Schwartz, *Patent Law and Practice* at pp. 134–35, emph. added (a contributory infringer is one who sells a material *component* of the patented item or process not suitable for a substantial noninfringing use).

■ Pursuant to 35 U.S.C. § 271(c), one is a contributory infringer if he sells a component of the patented invention or assembly, the item sold constitutes a material part of the invention, the seller knows that the item is especially made for or can be adapted for use in an infringement of the patent, and the item sold is not suitable for a substantial noninfringing use. Here, Plaintiffs allege, and the evidence is clear, that Polypap sells the entire Bouquett'O product and offers it for sale. **Accordingly, the Court FINDS that Polypap is NOT liable for contributory infringement.**

■ Last, Plaintiffs argue that Andre and Philippe Charrin also committed contributory infringement by exercising day-to-day control of Polypap's activities. As stated above, corporate officers can be personally liable for direct infringement by their corporation, if the corporate veil is pierced. Schwartz, *Patent Law and Practice* at p. 134. Corporate officers who act culpably also can be liable for actively inducing their corporation's direct infringement. *Id.* at 136. However, corporate officers cannot be held liable for con-

tributory infringement under the facts presented here.

As stated above, one is a contributory infringer if he sells a component of the patented invention or assembly, the item sold constitutes a material part of the invention, the seller knows that the item is especially made for or can be adapted for use in an infringement of the patent, and the item sold is not suitable for a substantial noninfringing use. 35 U.S.C. § 271(c). In the case sub judice, the Charrins have sold the Bouquett'O in its entirety on behalf of Polypap. They do not sell components of the Bouquett'O. Plaintiffs argue that the Charrins are liable for contributory infringement by selling the Bouquett'O itself. Although a claim such as this could have been argued as one of inducement (albeit unsuccessfully as the Court noted earlier), it does not fall under contributory infringement. **Accordingly, the Court FINDS that Andre Charrin and Philippe Charrin are NOT personally liable for contributory infringement.**

## E. *Defendants' Affirmative Defenses*

In their defense, Defendants argue that the patents are invalid. As such, Defendants have asserted a number of affirmative defenses pursuant to 35 U.S.C. § 102 (anticipation), § 103 (obviousness), and § 112 (indefiniteness).

### 1. *Anticipation under 35 U.S.C. § 102*

First, Defendants argue that Plaintiffs' patents were anticipated by a French patent Defendants hold (which does not specifically cover the Bouquett'O), by a patent issued to Bertels in 1899, and by a product made by Highland Supply Company (the company to which the patents at issue are licensed) called the Speed–Cover®.

Under 35 U.S.C. § 102(b), a patent is anticipated if "(a) the invention was known or used by others in this country, or patented or described in a printed publication

in this or a foreign country, before the invention thereof by the applicant for patent, or (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States."

 Anticipation requires the presence in a single prior art disclosure of each and every element of a claimed invention. *Electro Medical Systems S.A. v. Cooper Life Sciences, Inc.,* 34 F.3d 1048, 1052 (Fed.Cir.1994). The reference must actually "enable" one of ordinary skill in the art to practice the allegedly anticipated invention. *Symbol Technologies, Inc. v. Opticon, Inc.,* 935 F.2d 1569, 1578 (Fed. Cir.1991). Anticipation is a question of fact. *Acromed Corp. v. Sofamor Danek Group, Inc.,* 253 F.3d 1371, 1378–79 (Fed. Cir.2001).

In this case, the evidence is undisputed that the Charrins hold a French patent for holding flowers in a block of material with a covering, French Patent Publication No. 2,619,698, which was published more than one year before the filing date of both of Plaintiffs' patents at issue. Defendants argue that the Charrin patent application discloses each and every element of the asserted claims of the patents-in-suit. This argument is based upon Defendants' contention that the embodiment shown in Figure 5 of the Charrin patent application and described in the text thereof discloses the use of "floral holding material" as the medium into which the stems of flowers are shown as having been inserted. *See* Defendant's Exhibit 35.

However, neither the text of the Charrin patent application nor Figure 5 bears out Defendants' claim. The original and untranslated text of the Charrin patent application identifies the medium into which the stems are inserted as "mousse." The parties disagree over the correct translation of this term from French into English. Plaintiffs contend that "mousse" means "moss" which *would fail* to disclose the use of "floral holding material" in the Charrin patent. Defendants, on the other hand, contend that it means "foam" which *would* disclose the use of "floral holding material."

In support of their interpretation, Plaintiffs point to the English translation of the Charrin patent application found in the file wrapper of Plaintiffs' '532 patent. That translation, which was apparently relied upon by the Patent and Trademark Office ("PTO") examiner who allowed the claims of Plaintiffs' '532 patent over the Charrin patent application, identified "mousse" as "moss" and was derived from two French to English dictionaries which Plaintiffs also presented at trial (Plaintiffs' Exhibits 18 and 19). According to both dictionaries, the term "mousse" has a variety of definitions. In the context of things botanical, however, the primary English definition of "mousse" is moss.

 Andre and Philippe Charrin, both of whom are interested parties, testified that "mousse" is correctly translated into English as "foam." They thereby suggest that the Charrin patent application establishes that Andre Charrin was a prior inventor of the invention described in the asserted claims. However, Defendants offered no corroboration to support their testimony. If testimony relating to a prior invention is from an interested party, it must be corroborated. *Schumer v. Laboratory Computer Systems, Inc.,* 308 F.3d 1304, 1316 (Fed.Cir.2002).

Figure 5 also supports a conclusion that "mousse" is moss. In the drawing, the "mousse" is shown tied with a string or wire—an indication that the material is incapable of holding its predetermined shape, which is a necessary element of the term "floral holding material."

■ Therefore, based upon the evidence it has before it, the Court now concludes that the term "mousse" as it is used in the Charrin patent application is correctly understood in the context of the patent disclosure as moss. As such, it does not describe "floral holding material" as it has been defined by this Court.

Furthermore, there is at least one critical element present in the patents in suit which are not disclosed by the Charrin patent application. Claim 15 of the '856 patent contains a limitation which requires that a "crimped portion" be created in the sheet of material with at least one overlapping fold being created and with the overlapping fold being substantially bonded via the means for forming the crimped portion. The Charrin patent application does not disclose these elements. Instead, the Charrin patent application teaches a method of tying a sheet of material above a pot or moss with a string interlaced through a series of two closely spaced holes which are located adjacent to the outer edge of the sheet. As a result, Defendants offer no evidence that a crimped portion is formed in the sheet of material and, therefore, there is no basis for the Court to conclude that overlapping folds are created in the sheet of material.

■ Also, as referenced above, the Charrin patent application was cited to and expressly considered by the examiner during the prosecution of the '532 patent. This is highly significant. When a party alleges that a claim is invalid based on the very same references that were before the examiner when the claim was allowed:

> the attacker … has the added burden of overcoming the deference that is due a qualified governmental agency presumed to have properly done its job, which includes one or more examiners who are assumed to have some experience in interpreting the references and to be familiar from their work with the level of skill in the art and whose duty it is to issue only valid patents.

*Ultra–Tex Surfaces, Inc. v. Hill Brothers Chemical Co.,* 204 F.3d 1360, 1367 (Fed. Cir.2000). Defendants offer no evidence to rebut the presumption that the examiner properly construed the Charrin patent application and properly found that it was not a significant prior art reference.

For all these reasons, the Court concludes that Defendants have failed to present clear and convincing evidence that the asserted claims are invalid under 35 U.S.C. § 102 as anticipated by the Charrin patent application.

Next, Defendants argue that the Bertels patent issued in 1899 anticipates Plaintiffs' patents at issue. The Court finds that it does not. As shown by Plaintiffs' Exhibits 2 and 4, the PTO examiner considered the Bertels patent during the prosecution of the '532 patent. Moreover, the teachings of the Bertels patent and the Charrin patent are substantially identical. Accordingly, the Court concludes that Defendants have failed to present clear and convincing evidence that the asserted claims are invalid under 35 U.S.C. § 102, as anticipated by the Bertels patent.

■ Last, Defendants argue that Highland Supply Company's Speed–Cover® anticipates Plaintiffs' patents at issue. Again, the Court finds that it does not. The evidence at trial clearly showed that the Speed–Cover® was not a decorative sheet of material as described by the patents at issue or the Bouquett'O. Rather, it is a "pot means" which holds the arrangement itself without a formal pot and is fabricated from a sheet of material. **Accordingly, the Court concludes that Defendants have failed to present clear and convincing evidence that the asserted claims are invalid under 35 U.S.C. § 102 as anticipated by Highland Supply Company's Speed–Cover®.**

### 2. Obviousness under 35 U.S.C. § 103

Defendants next claim that the patents at issue are invalid because they are obvious under 35 U.S.C. § 103. To prove invalidity under 35 U.S.C. § 103, Defendants must show by clear and convincing evidence that the claimed invention would have been obvious to a person of ordinary skill in the relevant art, at the time of the invention, based upon the teachings of one or more prior art references. *Rockwell International Corp. v. United States,* 147 F.3d 1358, 1364 (Fed. Cir.1998). Not to be confused with anticipation, "obviousness" means that "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a). Obviousness is a question of law based on factual evidence. *Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1535 (Fed.Cir.1983).

Although not cited during the prosecution of the '856 patent, the material disclosure contained in the Charrin patent application adds nothing to the disclosure contained in the Bertels patent which was cited by Plaintiffs and expressly considered by the PTO examiner. As stated above, the teachings of the Bertels patent and the Charrin patent are substantially identical. **Accordingly, the Court concludes that Defendants have failed to establish by clear and convincing evidence that the asserted claims of the patents in suit are invalid under 35 U.S.C. § 103 as obvious.**

### 3. Indefiniteness under 35 U.S.C. § 112

Last, Defendants assert that the patents are invalid because they are indefinite under 35 U.S.C. § 112, since "they fail to particularly point out and distinctly claim the subject matter of the invention", inter alia, by using the vague and imprecise terms "without pot means" and "floral holding material." *See Defendants' Answer to Plaintiffs' Amended Complaint.*

Under 35 U.S.C. § 112, a patent specification must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." A claim is indefinite only if one of ordinary skill in the art would be unable to understand the scope of the claim when read in light of the specification. *Personalized Media Communications, LLC v. International Trade Comm'n,* 161 F.3d 696, 705 (Fed.Cir.1998)("**If the claims read in light of the specification reasonably apprise those skilled in the art of the scope of the invention, § 112 demands no more.**").

In asserting that the claims at issue are indefinite and therefore invalid, Defendants are confronted with a "heavy presumption" that "the examiner reviewed the adequacy of the descriptions and found the patent descriptions to be definite [in accordance with the requirements of 35 U.S.C. § 112] and allowed the patents thereafter." *Water Tech. Corp. v. Calco Ltd.,* 658 F.Supp. 961, 972 (N.D.Ill.1986). As with its other invalidity defenses, Defendants must present clear and convincing evidence of indefiniteness to prevail on this issue. *Waterloo Furniture Components, Ltd. v. Haworth,* 798 F.Supp. 489, 492–93 (N.D.Ill.1992).

The law presumes that the PTO examiner who conducted the prosecution of both the '856 and '532 patents understood the requirements of 35 U.S.C. § 112. The evidence bears this out. During the prosecution of the '856 patent, the PTO examiner rejected a number of claims "as being indefinite for failing to

particularly point out and distinctly claim the subject matter which applicant [sic] regards as the invention" (Plaintiffs' Exhibit 2). After these claims were subsequently amended by the Plaintiffs, they were allowed. During the prosecution of the '532 patent, none of the claims were rejected. Had the '856 claims as amended in response to the PTO's Office Action or the '532 claims failed to meet the "definiteness" requirement of 35 U.S.C. § 112, the Court presumes the PTO examiner would have rejected them. 37 C.F.R. § 1.104(c); *Manual of Patent Examining Procedure*, § 2163.01 ("MPEP").[3] **Because Defendants have failed to offer clear and convincing evidence rebutting this presumption, the Court concludes that Defendants have failed to establish by clear and convincing evidence that the asserted claims of the patents in suit are invalid under 35 U.S.C. § 112 as being indefinite.**

## F. *Inequitable Conduct*

Finally, Defendants assert that the patents at issue are unenforceable because Plaintiffs and/or their patent counsel misled the PTO examiner by omitting pertinent information and burying other pertinent information.

"A patent by its very nature is affected with a public interest." *Blonder–Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 343, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). Each individual associated with the filing and prosecution of a patent application bears a stringent duty of candor and good faith in dealing with the PTO. 37 C.F.R. § 1.56. This includes the affirmative obligation to disclose to the PTO "all information known to that individual to be material to patentability." *Id.* However, "[t]here is no duty to submit information which is not material to

the patentability of any existing claim." *Id.* "Information is material to patentability when it is not cumulative to information already of record or being made of record in the application." *Id.*

■ Inequitable conduct, which can render a patent unenforceable, is defined as "the failure to disclose material information, or the submission of false, material information with an intent to deceive." *Litton Systems, Inc. v. Honeywell, Inc.*, 87 F.3d 1559, 1570 (Fed.Cir.1996). Both materiality and intent must be proven by clear and convincing evidence. *Id.*

A charge of inequitable conduct cannot be based upon the failure to cite prior art which is not "material." *Engel Industries, Inc. v. Lockformer Company*, 946 F.2d 1528, 1533–34 (Fed.Cir.1991). Neither an applicant nor counsel can be found to have engaged in inequitable conduct merely because of their failure to disclose an otherwise material reference, "if the reference is cumulative or less material than those already before the examiner." *Halliburton Co. v. Schlumberger Technology Corp.*, 925 F.2d 1435, 1440 (Fed.Cir.1991); *Engel*, 946 F.2d at 1533–34 (**"When a reference is cumulative to other prior art that was before the examiner, the element of materiality is not established and inequitable conduct cannot lie."**); *Molins PLC v. Textron Inc.*, 48 F.3d 1172, 1185 (Fed.Cir. 1995)(**"A reference that is cumulative to other references of record does not meet the threshold of materiality needed to prove inequitable conduct."**).

■ Even in those instances where it can be shown that an applicant or counsel failed to cite "material" and non-cumulative prior art to the PTO, inequitable conduct will not lie unless there is clear and convincing evidence that the failure to cite

---

3. The MPEP sets forth rules which govern the handling of patent applications by the PTO.

*See Ethicon v. Quigg*, 849 F.2d 1422, 1425 (Fed.Cir.1988).

such prior art manifested an "intent to deceive." *Gambro Lundia AB v. Baxter Healthcare Corp.*, 110 F.3d 1573, 1581 (Fed.Cir.1997); *Kingsdown Medical Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 876 (Fed.Cir.1989).

▮ First, Defendants argue that Plaintiffs purposefully failed to include the French language text of the Charrin patent in Plaintiffs' application for the '532 patent in an effort to mislead the PTO examiner and also failed to include the Charrin patent at all in connection with the '856 patent. Although the parties dispute the translation of the term "mousse" as "moss" or "foam," as described above, the Court finds that Defendant did not prove Plaintiffs' translation was inaccurate at trial. Although Defendants testified that "mousse" means "foam," this testimony was not corroborated as required by law. *Schumer*, 308 F.3d at 1316. Plaintiffs produced a French to English dictionary and other witnesses who testified that in the context of botanicals, "mousse" means "moss." Accordingly, the Court cannot find that the translation provided to the PTO was misleading or inaccurate.

Furthermore, although the Charrin patent application was not cited during the prosecution of the '856 patent, it disclosed nothing more than was disclosed in the Bertels patent which was cited. Since the Charrin patent application was merely cumulative of the art of record in the prosecution of the '856 patent, as the Court has found above, it was not material to the patentability of the claims sought. Accordingly, neither Plaintiffs nor their patent counsel were under any obligation whatsoever to cite it.

Second, Defendants argue that Plaintiffs buried references among many other unrelated references in order to mislead the PTO examiner. Although Plaintiffs submitted many references to the PTO and received a letter with regard to the '532 patent that the references obscured Plaintiffs' prior art statement, the Court finds that the PTO examiner who oversaw the prosecution of the '532 patent actually initialed each of the references indicating that he considered each of them when deciding to allow the '532 patent to issue. *See* Plaintiffs' Exhibit 4. Accordingly, there is no basis upon which to conclude that the prior art submissions made by Plaintiffs and their attorneys were improper.

Last, Defendants argue that Plaintiffs misled the PTO examiner in its submission of the 1989 Highland Supply Company Speed–Cover® brochure by not pointing out that the brochure stated that the Speed–Cover® "arrange[s] fresh flowers in floral foam, no container." Defendants seem to argue that this statement would have rendered claim 15 unpatentable. The Court disagrees. The PTO examiner is presumed to have read the brochure in its entirety. Moreover, since the brochure is listed on the face of the '856 patent and initialed with the Information Disclosure Statement ("IDS") submitted during the prosecution of the '532 patent, the Court finds that the PTO examiner specifically reviewed the document and found that it failed to render either application unpatentable. *See* Plaintiffs' Exhibits 1, 2, and 4. Accordingly, there is no basis upon which to conclude that any failure to specifically point out this sentence in the brochure was improper in any way.

**The Court therefore concludes that Defendants have failed to offer any evidence which proves by clear and convincing evidence that Plaintiffs or their patent counsel committed inequitable conduct during the prosecution of either of the patents in suit.**

## VI. *CONCLUSION*

The Court **FINDS** that Plaintiffs have established by a preponderance of the evi-

dence that Polypap has directly infringed claim 15 of the '856 patent. The Court also **FINDS** that Plaintiffs have established by a preponderance of the evidence that Polypap directly infringed claim 9 of the '532 patent. The Court **FAILS TO FIND** that any other party engaged in inducement of infringement, contributory infringement, or inequitable conduct. The Court also FAILS TO FIND that either patent at issue is invalid. **Since Plaintiffs have waived their claim for damages and seek only permanent injunctive relief, the Court PERMANENTLY ENJOINS Defendant Polypap from further infringing on the patents at issue by making, using, or selling the Bouquett'O or instructing others in its use.**

For docketing purposes, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' and Plaintiffs' *oral* motions under Rule 52(c) with regard to the issues of infringement, inducement of infringement, and contributory infringement and **GRANTS** Plaintiffs' oral motion under Rule 52(c) with regard to Defendants' affirmative defenses (*see* Doc. 113).

**IT IS SO ORDERED.**